IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHELLY D.,[1]                                                    Case No. 6:24-cv-00717-JR

          Plaintiff,                                       OPINION AND ORDER

       v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

          Defendant.

RUSSO, Magistrate Judge:

      Plaintiff Shelly D. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Title II Disability Insurance Benefits under the Social Security Act. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded for further proceedings.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

## PROCEDURAL BACKGROUND[2]

Born in April 1964, plaintiff alleges disability beginning March 31, 2021, due to depression, anxiety, insomnia, hypertension, diabetes, neuropathy, "acute respiratory distress," and shoulder, knee, hip, back, and hand pain. Tr. 15, 38, 176, 190. Her application was denied initially and upon reconsideration. On November 30, 2023, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a vocational expert ("VE"). Tr. 34-54. On January 5, 2024, the ALJ issued a decision finding plaintiff not disabled. Tr. 15-28. After the Appeals Council denied her request for review, plaintiff filed a complaint in this Court. Tr. 1-6.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date. Tr. 17. At step two, the ALJ determined the following impairments were medically determinable and severe: "obesity; lumbar degenerative disc disease; left wrist arthropathy; history of right knee replacement; and peripheral neuropathy." *Id.* At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 20.

Because she did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected her ability to work. The ALJ resolved that plaintiff had the residual function capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except:

> [S]he can stand/walk a total of two hours per day; occasionally push/pull with the dominant left upper extremity; never climb ladders, ropes, or scaffolds, crouch,

---

[2] The record before the Court is approximately 900 pages, but with multiple incidences of duplication. Where evidence occurs in the record more than once, the Court will generally cite to the transcript pages on which that information first appears in its entirety.

kneel, or crawl; occasionally climb ramps and stairs, balance, and stoop; occasionally handle with the left upper extremity; frequently finger with the left upper extremity; and she must avoid concentrated exposure to vibration.

Tr. 21.

At step four, the ALJ determined plaintiff was capable of performing her past relevant work as a customer service/complaint clerk. Tr. 27.

## DISCUSSION

Plaintiff argues the ALJ erred by: (1) discrediting her subjective symptom statements; (2) failing to comment on the lay testimony of her spouse; and (3) improperly assessing the medical opinions of Raymond Nolan, M.D., and Keerti Jaini, M.D.

## I.    Plaintiff's Testimony

Plaintiff contends the ALJ erred by discrediting her testimony concerning the extent of her physical impairments. When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). In other words, the "clear and convincing" standard requires an ALJ to "show [their] work." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022).

Thus, in formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, *available at* 2017 WL 5180304. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted). The question is not whether the ALJ's rationale convinces the court, but whether the ALJ's rationale "is clear enough that it has the power to convince." *Smartt*, 53 F.4th at 499.

At the hearing, plaintiff testified she became unable to work in March 2021 after falling and breaking her left wrist. Tr. 43. Plaintiff sought immediate care but did "not have surgery." Tr. 43-44. In fact, plaintiff reported that all of the doctors she consulted instructed against surgery "because it wouldn't make a difference." *Id.* She indicated her wrist symptoms have gotten a "little" worse since the initial injury, which "was expected." Tr. 44. Plaintiff endorsed pain "most [of] the time" and an inability hold a knife or pen, peel vegetables, write, or "be on a computer." Tr. 44-45. In regard to the latter, plaintiff stated she could use a keyboard for less than five minutes. Tr. 45.

Plaintiff also testified that she was significantly limited by her back and right knee. Tr. 46-47. She explained that she "start[s] something and [has] to come back and sit down because [her] back would start hurting." Tr. 46. And her right knee "gives out a lot" and prevents her from bending down and lifting (in conjunction with her wrist). Tr. 47. As a result, she "lose[s] balance a lot" and must always have someone or something to hold onto while walking. *Id.* Plaintiff

testified that, due to her back and hip pain,[3] she could sit for 10 minutes at a time – but "the worst is standing, walking," suggesting a lesser ability to persist in those activities. Tr. 47-48.

After summarizing the hearing testimony, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 22-23. The ALJ specifically cited to plaintiff's activities of daily living, treatment history, and the objective medical record. Tr. 23-26.

Concerning the ALJ's first rationale, "[e]ven where [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (superseded by statute on other grounds). Substantial evidence supports the ALJ's decision in this regard.

Notably, there are myriad references in the record reflecting that plaintiff's physical abilities exceeded the limitations she articulated at the hearing. For instance, in her "Adult Function Report" from the outset of the adjudication period, plaintiff did not endorse any problems with sitting. Tr. 202. She reported engaging in a number of sedentary activities without limitation, such as reading, watching television, and using the computer (when her hands did "not hurt"). Tr. 201.

Likewise, in an updated "Adult Function Report," plaintiff reported "reading, watching movies, board games with friends, baking, [and] cooking" as hobbies, with "reading [and] tablet

___
[3] The ALJ resolved that "hip pain" and "breathing problems" were not medically determinable impairments at step two, and plaintiff does not challenge that finding on appeal. Tr. 19.

[use occurring] most days." Tr. 246. Plaintiff also reported driving six hours "2 or 3 [times] a year" to visit a "friend in Washington . . . for a weekend." *Id.*; *see also* Tr. 868 (plaintiff reporting to her provider in May 2023 that she was concerned about hip pain, for which she ultimately obtained an injection, because "[s]he is planning a trip to northern Washington [and wanted to] cross into Canada to visit Victoria where they will do a lot of walking"). Although plaintiff remarked that "sometimes" she had to stop driving halfway "because of back or hip pain," she did not indicate any problems sitting for three hours at a time. Tr. 246.

On her "Pain and Other Symptoms" questionnaire, plaintiff did not list sitting as one of the "activities or circumstances [that caused] pain or other symptoms." Tr. 230. She separately commented that she was "usually good with sitting" but still tried to "get up every hr. to move around." *Id.* And her spouse specified that she read or watched television "8 to 10 hours a day" and socialized with friends one-to-two times per week by "dining, talking, watching t.v., [and playing] occasional card games," and otherwise did not designate any sitting problems unless it was for "great periods of time." Tr. 220, 224-25.

Further, the evidence of record demonstrates that plaintiff engaged in a number of other tasks – including shopping for food and household items (in-person one-to-two times per week for "1 hour to 1 ½ hours at t time" or online for "1 hour to 5 or 6 hours"), vacuuming/sweeping/dusting (several times per week for approximately 20 minutes at a time), washing the dishes, trimming her outdoor bushes, cooking, bathing the dog, dining out, and socializing with family or friends. *See, e.g.*, Tr. 199-201, 220-24, 243-46, 721. And, for at least part of the adjudication period, plaintiff watched her grandchildren (aged two and four at the time) with her spouse every other week for "2-3 hrs. a day." Tr. 198, 486. She additionally denoted going "outside [to] make sure toys are picked up about 1-2 times a wk. when kids are here." Tr. 200. The ALJ reasonably inferred from

the aforementioned activities that plaintiff's physical functional abilities were greater than alleged. *See Febach v. Colvin*, 580 Fed.Appx. 530, 531 (9th Cir. 2014) (ALJ is not required to accept a claimant's attempt to characterize activities as consistent with disability where those activities "could also reasonably suggest" greater functional abilities) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004)).

Turning to the ALJ's remaining rationales, "whether the alleged symptoms are consistent with the medical evidence" is a relevant consideration. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007). Relatedly, the failure to follow prescribed treatment is a legitimate reason to reject a claimant's subjective symptom testimony. *Trevizo v. Berryhill*, 871 F.3d 664, 680 (9th Cir. 2017).

Plaintiff was referred to physical therapy for her wrist, back, and knee pain. Tr. 294, 454, 529, 559, 587-88, 624. However, as the ALJ accurately observed, there is no evidence that she attended physical therapy, or was otherwise unable or unwilling to do so. Tr. 25. As discussed below, while plaintiff possessed a seeming aversion to surgery, neither the record nor briefing suggest that she shared a similar aversion to non-invasive treatment and, indeed, plaintiff regularly sought routine care and took her medications as prescribed. *See Miguel S. v. O'Malley*, 2024 WL 4643098, *5 (S.D. Cal. Oct. 30), *adopted by* 2024 WL 5184292 (S.D. Cal. Dec. 20, 2024) ("the burden of proof is on the claimant at steps one through four, and the mere possibility that an acceptable reason exists for Plaintiff's noncompliance with treatment does not satisfy that burden") (citation and internal quotations omitted); *see also Alicia E.C. v. Kijakazi*, 2022 WL 21841724, *8 (C.D. Cal. Apr. 14, 2022) (affirming the ALJ's rejection of the claimant's subjective symptom testimony where, among other reasons, she "has not provided evidence of any acceptable reason for her failure to follow prescribed treatment").

Page 7 – OPINION AND ORDER

The objective medical record as it relates to plaintiff's wrist also belies her hearing testimony. Plaintiff first presented to the emergency department on March 31, 2021, where she was diagnosed with a "likely fracture." Tr. 603. She sought follow-up care with South Coast Orthopedic Associates approximately one week later. Tr. 568. At that time, she noted "moderate" pain with symptoms that "come and go." *Id.* Her wrist, forearm, and hand were swollen and bruised. Tr. 569. Plaintiff's treatment plan indicated "a stable fracture that will heal nicely with conservative management." Tr. 569-70. As such, surgery was not recommended due to the "very mild loss of the radial height and angulation" and the fact that plaintiff indicated she "is left-handed . . . but does not require any high level fine motor skills." *Id.* Plaintiff's arm was placed in a cast and she was told to follow-up in four weeks. *Id.*

Plaintiff returned to the clinic early for a new cast after hers became "loose and [was] not stabilizing the wrist." Tr. 567. She also sought and obtained pain medication from her primary care provider. Tr. 440-43, 542, 545-48.

On May 7, 2021, plaintiff re-presented to South Coast Orthopedic Associates. Tr. 564. Plaintiff had "a lot of pain at the wrist but admitt[ed] it . . . improved over the past 4 weeks." *Id.* An examination revealed "only mild swelling and no erythema at the left wrist," with "moderate" tenderness "to the touch at the distal radius more dorsal than volar." Tr. 565. She was able to flex her hand and wrist although was "limited by pain in both directions." *Id.* Wrist x-rays showed a "healing distal radius fracture . . . Other than the longitudinal impaction the overall alignment looks good." *Id.* Plaintiff was told that she had "a high risk of posttraumatic arthritis" due to the type of injury and was advised of her surgical options:

> This is something that can be fixed but would require open surgery to do. She is declining that option. She would prefer to wait this out and see how it turns out. She may not have any problems with it. It is something that can be fixed later which would be a little more difficult because it would be a malunion repair and would

need to be done from the volar side, and fixed with a volar buttress plate. She will come back in a month and will take another set of x-rays. For the time being we put her into a Velcro wrist brace and asked her to wear it essentially full-time except for bathing and performing range of motion exercises for the first few weeks and then to start to wean from the brace as comfort allows.

*Id.*

On June 4, 2021, plaintiff obtained additional care at South Coast Orthopedic Associates. Tr. 561. Plaintiff's "pain [had] been improving steadily," such that her "main complaint [was] loss of motion." *Id.* She asked whether her wrist injury could be used to support her claim "for permanent Social Security disability because of her hip and some other issues." *Id.* Her provider advised "she would need to wait until this is fully healed before she makes a decision whether she has some kind of impairment caused by this fracture." *Id.*

Upon examination, "alignment look[ed] normal" and "[s]welling [was] minimal." Tr. 562. There was a "trace of tenderness remaining at the dorsal distal radius . . . maybe slightly worse at the volar side of the distal radius but the radial styloid itself [was] nontender." *Id.* Her range of motion had improved and there was "no crepitus within any of that range." *Id.* Plaintiff was told she was still at risk for "posttraumatic arthritis and some permanent loss of motion compared to preinjury" but overall her symptoms would "continue to improve for several months before she plateau[d]." *Id.* Plaintiff was encouraged to "continue to advance her activities . . . if she remain[ed] satisfied with her progress she [did] not need to return for any more follow-up visits." *Id.*

Despite seeking treatment from South Coast Orthopedic Associates and her primary care provider for back/hip pain and other conditions, plaintiff did not obtain any further care for her left wrist until December 9, 2021. Tr. 556-60, 586.

Specifically, plaintiff visited South Coast Orthopedic Associates related to "the gradual worsening of her left wrist pain." Tr. 586. Her provider denoted:

> She is 8 or 9 months out from her left wrist fracture which was an initially slightly displaced volar dye punch type fracture of the distal radius which over the next few months shifted with some volar and proximal displacement of that fragment. The entire time we are treating her she was adamantly against the idea of surgery because this type of fracture would have benefited from a small buttress plate on the volar side. She is still adamantly against surgery even at this time. She has noticed significant loss of motion of the wrist and some increased pain. There has not been any new trauma. She had to change the way she holds a pen when she writes and she has lost grip strength, even with something as light as a full coffee cup.

*Id.* Upon examination, her wrist had "a slight 'S-curve' with the carpus and hand sitting slightly volar to the long axis of the forearm by maybe 4 to 6 mm." Tr. 587. She had some limitation in her range of motion and was "mildly tender to palpation." *Id.* However, imaging "show[ed] that the volar dye punch fragment [was] still in roughly the same position that it was at the last films 6 months ago" and, although it was "difficult to determine the severity of any arthritic changes[,] the radiocarpal joint space appear[ed] to be fairly well-preserved between the radius and lunate in particular." *Id.*

Plaintiff's provider articulated "many treatment options":

> The last resort would be a wrist replacement although I would say at this time is not anywhere close to needing that kind of treatment. The dye punch fragment can be realigned doing an osteotomy procedure followed by the placement of a volar plate. This would require most likely cutting the bone with a small saw and moving the fragment. That will be very difficult to do perfectly. Another option at a later date would be a proximal row carpectomy if this becomes painful enough. I doubt there is any arthroscopic surgery that would help. For the time being I recommend nonsurgical treatment as long as possible and she is in full agreement. She has a bias against any surgical treatment so far.

Tr. 587-88. Plaintiff subsequently requested referral to another specialist. *Id.*

To that end, plaintiff was seen at Slocum Orthopedics on February 24, 2022. Tr. 624. She complained of "discomfort," "difficulty lifting objects and doing everyday activities," and arm

weakness. *Id.* Upon examination, she had a slightly limited range of motion in her left wrist, "[f]ull finger motion," "[n]ormal light touch sensation," and "[p]ain with ulnar deviation both pronation and supination." Tr. 624-25. Plaintiff continued to communicate that she "was not interested in surgical options." Tr. 624. Accordingly, her treatment plan stated:

> She might have some ulnocarpal impingement that could be fixed with wafer or shortening osteotomy. However, it would be exceedingly difficult to make her wrist better with any sort of intra-articular radius osteotomy. We discussed treatment options including further surgical intervention as well as non-operative treatments including heat, ice, massage, topical rubs and creams . . . if she feels in the future she is having to adjust her life around her wrist then she can call to discuss surgical treatment. She will call with trouble.

*Id.*

Plaintiff did not seek wrist treatment again until November 7, 2022, at which point she presented to her primary care provider with "constant pain," "limited range of motion," and "numbness in the fingers." Tr. 676. She had "been using a brace, but her grandkids destroyed it." *Id.* Plaintiff was provided with a "carpal tunnel brace" at that time. Tr. 680. There is nothing in the record beyond that point indicating ongoing treatment for wrist pain.

In sum, because the ALJ cited at least one legally sufficient reason, supported by substantial evidence, his decision is affirmed as to plaintiff's subjective symptom testimony. *See Batson*, 359 F.3d at 1197 (ALJ's evaluation of the claimant's subjective symptom testimony may be upheld even if all the reasons proffered are not valid).

## II.    Lay Testimony

Plaintiff next asserts that the ALJ's rejection of "the lay testimony in this case without articulating any basis supported by substantial evidence" violated "the revised regulations." Pl.'s Opening Br. 17-18 (doc. 13).

The Ninth Circuit, however, recently held that the "revised Social Security regulations are clearly irreconcilable with our precedent requiring 'germane reasons' to reject lay witness testimony." *Hudnall v. Dudek*, -- F.4th --, 2025 WL 729701, *2-3 (9th Cir. Mar. 7, 2025). As a result, the "'germane reasons' precedent no longer applies to claims filed on or after March 27, 2017, and in considering such claims, ALJs need not explain their reasons for discounting evidence from nonmedical sources." *Id.* at *3.

Thus, the ALJ in this case did not err. Even so, any such error would be harmless given that plaintiff and her spouse's statements regarding her physical limitations were substantially similar. *See De Mello v. Kijakazi*, 2022 WL 17583054, *1 (9th Cir. Dec. 12, 2022) (any error in discounting the third-party statements was harmless where the ALJ's reasons for rejecting the claimant's testimony applied with equal force to the lay witness testimony) (citing *Molina*, 674 F.3d at 1122).

## III. Medical Opinion Evidence

Plaintiff argues the ALJ improperly discredited the opinions of Drs. Nolan and Jaini. Where, as here, the plaintiff's application is filed on or after March 27, 2017, the ALJ is no longer tasked with "weighing" medical opinions, but rather must determine which are most "persuasive." 20 C.F.R. § 404.1520c(a)-(b). "To that end, there is no longer any inherent extra weight given to the opinions of treating physicians . . . the ALJ considers the 'supportability' and 'consistency' of the opinions, followed by additional sub-factors, in determining how persuasive the opinions are." *Kevin R. H. v. Saul*, 2021 WL 4330860, *4 (D. Or. Sept. 23, 2021). The ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" and "explain how [they] considered the supportability and consistency factors." *Id.* At a minimum, "this appears to necessitate that an ALJ

specifically account for the legitimate factors of supportability and consistency in addressing the persuasiveness of a medical opinion." *Id.*

On September 23, 2021, plaintiff presented to Dr. Nolan for a physical consultative examination. Tr. 506. Plaintiff's chief complaint was respiratory issues. *Id.* Upon examination, plaintiff exhibited a normal range of motion in her back, hips, ankle, and knees, but a limited range of motion in her left wrist. Tr. 507. She was "[a]ble to go from sitting to standing without difficulty" and "walk on toes and heals." *Id.* Her gait, tandem gait, Romberg, squat rise maneuver, and Trendelenburg were normal. *Id.* Plaintiff had some tenderness with palpitation on her right shoulder and left knee. *Id.* Her finger exam showed the ability "to make a full fist," a normal range of motion, "no joint deformities," "no synovial thickening or tenderness to joint palpation," and "normal strength on the right and 4/5 weakness on the left," which was "[p]ossibly related to her recent wrist injury." *Id.* She exhibited an analogous level of weakness in her left wrist, but all other strength testing was normal, as was her sensory testing and deep tendon reflexes. Tr. 507-08. Additionally, she was "[a]ble to manipulate items without difficulty" and had "no obvious muscle atrophy." *Id.* Based on testing, fibromyalgia could not be "definitively rule[d] in or rule[d] out." Tr. 508.

The "Assessment" section of Dr. Nolan's report listed the following impairments: "resting tachycardia and diaphoresis, in spite of the fact that she is on Verapamil which should have some cardiac rate suppressing activity"; "[b]ilateral knee pain presumably related to degenerative arthritis secondary to her obesity"; "[d]iabetes mellitus without peripheral neuropathy"; "[s]tatus post left wrist injury with residual motor weakness distally"; "[h]istory obstructive sleep apnea on treatment"; "[h]istory low back [and] hip pain"; "[h]istory that might be compatible with carpal tunnel syndrome but with negative Tinel's sign, no sensory deficits, and left-sided weakness

involving the extensor policis brevis muscle group which can easily be explained by the alternate

consideration of her left wrist injury." *Id.* In terms of "functional capabilities," Dr. Nolan opined:

> [Plaintiff] would want to avoid squatting and kneeling activity. Bending, twisting
> and turning the trunk should be limited to occasional basis. Lifting and carrying
> should be limited to 10 pounds on a frequent basis and up to 20 pounds on occasion.
> Repetitive hand wrist activity on the left side should be limited to occasional basis.
> She has been advised that she should follow-up with her primary care providers
> regarding the unexplained tachycardia and diaphoresis. She should be able to sit for
> at least six hours in an eight hour day with opportunity for position change as
> needed for comfort. She should be able to stand up to 10 min. at a time and up to
> two hours [in an] eight hour day and she should be able to walk between one and
> two hours in an eight hour day. Her communication skills are quite adequate.

*Id.*

On November 21, 2023, Dr. Jaini[4] checked a box on a form prepared by plaintiff's attorney

indicating that she "agreed" with "all of the functional capabilities and limitations that are

identified in Dr. Nolan's report." Tr. 886.

The ALJ found the opinions of Drs. Nolan and Jaini "partly persuasive because they are

supported with explanation and most are supported by observations in his exam." Tr. 26. The ALJ

nonetheless rejected "the limitation of standing up to 10 minutes at a time" because it was "not

supported by observation, nor is it consistent with the objective medical evidence overall that

demonstrates full motor strength of the bilateral lower extremities, negative straight leg raise, and

primarily stable gait overall." *Id.* The ALJ also rejected the restriction surrounding plaintiff's "need

to sit then change position 'as needed'" because it was "not quantified, but due to its vagueness, it

is not inconsistent with the objective medical evidence in its totality, which indicates that

symptoms due to sitting could be relieved during customary breaks." *Id.*

---

[4] Although not specified within her report, the record reflects Dr. Jaini is a provider at plaintiff's
primary care facility and that she furnished some direct care later in the adjudication period. Tr.
735-41, 862-66, 875-80.

An independent review of the record reveals that the ALJ's consideration of the supportability and consistency of Dr. Nolan's and Dr. Jaini's opinion, along with the additional sub-factors, is not supported by substantial evidence. As an initial matter, an "as needed" position change restriction is neither unduly vague nor can it be accounted for with customary breaks.[5] *Cf. Buckner-Larkin v. Astrue*, 450 Fed.Appx. 626, 627 (9th Cir. 2011) ("a sit-stand option [may appear in an RFC and] is most reasonably interpreted as sitting or standing 'at-will'"); *Matthew Jacob C. v. Comm'r of Soc. Sec. Admin.*, 2024 WL 4100551, *2-3 (D. Or. Sept. 6, 2024) (doctor's opinion that the claimant "needs to be able to change position as needed for comfort" was essentially consistent with "a 30-minute sit/stand limitation").

In fact, courts within the Ninth Circuit have reversed ALJ decisions in relation to medical opinion evidence surrounding the claimant's "need to be able to change positions as needed for pain" even where objective imagining was lacking. *See, e.g., Crystal B. v. Comm'r of Soc. Sec.*, 2021 WL 1116263, *2 (W.D. Wash. Mar. 24, 2021). Here, in contrast, imaging of plaintiff's lumbar spine revealed "moderate multilevel degenerative endplate change" with "severe facet arthropathy at L4-L5 and L5-S1." Tr. 559, 575; *see also Dahl v. Comm'r of Soc. Sec. Admin.*, 2015 WL 5772060, *5 (D. Or. Sept. 30, 2015) (even "mild degenerative disc disease can have disabling effects") (collecting cases); *Ellefson v. Colvin*, 2016 WL 3769359, *6 n.5 (D. Or. July 14, 2016) ("mild degenerative changes do not necessarily equate to mild functional limitations"). Right knee imaging showed age-related arthritic changes but intact knee surgery hardware. Tr. 501-02, 697.

---

[5] Although Dr. Nolan's narrative report is perhaps not a model in clarity – he does plainly specify that plaintiff could stand or walk for no more than ten minutes at a time (and for no more than two hours in an eight hour workday), and could "sit for at least six hours in an eight hour day with opportunity for position change as needed." Tr. 508. These limitations, when read together (and in the context of Dr. Nolan's overall opinion), indicate that plaintiff would need to alternate between sitting and standing/walking throughout the day to alleviate her symptoms.

And plaintiff's obesity is often cited as a limiting factor as it relates to her pain and mobility given these diagnoses. *See, e.g.*, Tr. 529, 559, 698. The ALJ wholly ignored this evidence in discussing the "objective medical evidence overall" as it relates to Dr. Nolan's and Dr. Jaini's opinions. Tr. 26.

Moreover, an RFC for frequent left-sided fingering appears to be irreconcilable with Dr. Nolan's limitation to occasional "[r]epetitive hand wrist activity on the left side," especially considering that the ALJ found plaintiff's "left wrist arthropathy" and "peripheral neuropathy" medically determinable and severe at step two. Tr. 17, 21, 508. As such, even assuming the ALJ's reasons were legally sufficient in relation to this medical opinion evidence, they were not supported by substantial evidence such that reversal is warranted. *See Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (only mistakes that are "non-prejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion" are harmless).

## IV. Remedy

The decision whether to remand for further proceedings or for the immediate payment of benefits lies within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1176-78 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1090-1100 (9th Cir. 2014). The court may not award benefits punitively and must conduct a "credit-as-true" analysis on evidence that has been improperly rejected by the ALJ to determine if a claimant is disabled. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011); *see also*

*Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (summarizing the standard for determining the proper remedy).

As discussed herein, the ALJ committed harmful legal error by failing to properly evaluate the medical opinions of Drs. Nolan and Jaini. Further proceedings would nonetheless be useful in this case because the record is ambiguous as to plaintiff's functional abilities.

On one hand, it is undisputed that plaintiff's back and knee pain are longstanding conditions that are unlikely to be entirely remediated with conservative or non-conservative care due to plaintiff's weight and age. On the other hand, plaintiff refused available treatment options – namely, injections and physical therapy – that may have increased her strength and reduced pain symptoms. The record also demonstrates that, while plaintiff's wrist pain and limited range of motion may have been improved with surgical intervention at one point, it is unclear whether that continues to be the case (in part due to the lack of follow up care). Furthermore, there is some indication that plaintiff may have been more functional at the beginning of the adjudication period despite ongoing symptoms.

Finally, plaintiff was at least 55 years old at all relevant times, meaning that her age is a more significant factor in determining her entitlement to benefits. *See* 20 C.F.R. § 404.1563(a), (e) (defining a "person of advanced age" as being 55 or older and denoting that, "[i]n determining the extent to which age affects a person's ability to adjust to other work, we consider advancing age to be an increasingly limiting factor"); *see also Cindy Mae K. v. Comm'r or Soc. Sec. Admin.*, 2020 WL 6905317, *2-3 (D. Or. Nov. 24, 2020) (under the Medical-Vocational Guidelines, a finding of disability is proper for an "advanced age" claimant if she is limited to light work, cannot perform past relevant work, and "only [has] skills that are not readily transferable to a significant range of

semi-skilled or skilled work that is within the individual's functional capacity") (citation and internal quotations omitted).

As such, further proceedings are required to resolve this case. *See Treichler*, 775 F.3d at 1099 (except in "rare circumstances," the proper remedy upon a finding of harmful error is to remand for further administrative proceedings). Given the interplay between plaintiff's weight and spinal and joint issues, coupled with the ambiguity surrounding limitations associated with her left wrist (and the extent to which those interact with her ability to handle and finger), the use of a medical expert specializing in the appropriate physical discipline would be helpful. Therefore, upon remand, the ALJ must consult a medical expert to review the entire record and opine as to plaintiff's functional abilities during the adjudication period and, if necessary, reweigh the medical and other evidence of record, reformulate plaintiff's RFC, and obtain additional VE testimony.

## CONCLUSION

For the reasons stated above, the Commissioner's decision is REVERSED and this case is REMANDED for further proceedings.

IT IS SO ORDERED.

DATED this 18th day of March, 2025.


_____
/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge